IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| BRITTANY SAVILLE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 3:21-CV-11 (CAR) |
| ADDAY, INC. d/b/a IHOP #434, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |
| | : | |
| ADDAY, INC. d/b/a IHOP #434, | : | |
| | : | |
| Counter-Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BRITTANY SAVILLE, | : | |
| | : | |
| Counter-Defendant. | : | |
| _____ | : | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff/Counter-Defendant Brittany Saville ("Saville") filed this disability discrimination action against her former employer Defendant/Counter-Plaintiff Adday, Inc. d/b/a IHOP #434 ("Adday-I") asserting violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102 *et seq.* ("ADA"), and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"). Saville claims Adday-I unlawfully terminated her

employment because it perceived her as having a disability—COVID-19—and terminated her in retaliation for requesting a reasonable accommodation to quarantine; she also claims Adday-I interfered with her FMLA rights. Adday-I filed counterclaims against Saville for negligent misrepresentation and fraud under Georgia law. Adday-I moves for summary judgment on Saville's claims, and Saville moves for summary judgment on Adday-I's counterclaims. For the reasons explained below, no genuine issue of material fact exists for any claim; thus, both Motions [Docs. 33 and 35] are **GRANTED**.

## BACKGROUND

From June 4, 2018, until her termination on March 25, 2020, Saville was employed as the general manager of Adday-I's IHOP #434 restaurant in Athens, Georgia.[1] Adday-I franchised IHOP #434 from IHOP corporate.[2] Roble Mire is Adday-I's sole owner and CEO.[3] As general manager of IHOP #434, Saville reported directly to Mr. Mire.

On the morning of March 9, 2020, Saville informed Mr. Mire that she was not feeling well, running a fever, experiencing shortness of breath, body aches, chills, and was going to the hospital to be tested for COVID-19.[4] Saville had returned from a seven-day international cruise the day before and wanted to be tested before returning to work.[5] Saville went to the emergency room where medical practitioners evaluated her, took x-

---

[1] Pl. Depo., pp. 15, 61 [Doc. 35-4].
[2] Mire Depo., p. 16 [Doc. 35-6].
[3] *Id.* at pp. 14-16.
[4] Pl. Depo., pp. 18-26.
[5] *Id.* at 18.

rays, administered a COVID test, and gave her Tramadol.[6] They instructed her to self-quarantine for two weeks, until March 24, 2020, based on her symptoms and because she had been on an international cruise, and told her someone would contact her within the next 48 hours with her test results.[7]

As the general manager, Saville was responsible for preparing the payroll for Adday-I's employees. Saville informed Mr. Mire that if she tested positive, she "will need someone to do payroll."[8] The following text messages ensued:

> Mr. Mire:    I don't know who else besides you that knows how to do payroll. I never trained anyone else. All employees have to be paid tomorrow by 2pm. Figure out what's going on and keep me updated today.
>
> Saville:    All I can think of is I can go in tonight when it's closed and run the paperwork and write checks and I can give them to my brother and he can have them up there by 2 tomorrow but I don't need to be around anyone that can breathe the same air as me. R u okay with that.
>
> Mr. Mire:    That's fine, everything should be manually done. Sealed individually for each employee in an envelope.
>
> Saville:    Alright so I'll go in tonight to get papers and I'll also grab envelopes as well. I'll have it done. If anything changes I'll let you know but right now we are closed in one room and aren't being exposed to anyone around.

Late that night, after the restaurant was closed, Saville and her fiancé went to

---

[6] *Id.* at 18-25.
[7] *Id.* at 21-26.
[8] Text message to Mr. Mire [Doc. 34-5, p. 2].

3

the restaurant, so Saville could do payroll.[9] While inside the office, Saville heard a loud noise, and saw on the cameras that Mason Howle, the food delivery driver employed by Performance Food Service ("PFS"), had pulled up to unload the restaurant's regular Monday food products.[10] Saville called Mr. Howle. Saville states that she told him she did not feel well and asked him to wait to come inside until after she finished processing the paperwork.[11] Mr. Howle states Saville told him not to come inside because she had COVID, and she had to finish some paperwork.[12]

After speaking with Saville, Mr. Howle called his supervisor at PFS and told him that Saville was still in the restaurant, and he couldn't deliver the food products until she left because she had COVID.[13] Mr. Howle's supervisor then called Saville and asked if she could leave so Mr. Howle could make his delivery.[14] Saville, wearing a mask and gloves, exited the restaurant, spoke with Mr. Howle outside, and again told him she was sick.[15]

The next morning, on March 10, 2020, the Account Executive at PFS left Mr. Mire a voicemail and sent an email seeking confirmation whether Saville had COVID,

---

[9] Pl. Depo. p. 47; Howle Depo. pp. 15, 20 [Doc. 34-3].
[10] Pl. Depo., pp. 51, 54.
[11] *Id.* at p. 52.
[12] Howle Depo., p. 25
[13] *Id.* at p. 29; Pl. Depo., 52-53.
[14] Pl. Depo., p. 53.
[15] *Id.* at pp. 51, 54; Howle Depo, p. 32.

so she could determine whether their driver needed to be tested and quarantined.[16] It appears someone from PFS also contacted the Southeast Manager of IHOP corporate and told him that Saville had been inside IHOP #434, come in contact with the food delivery driver, and may have COVID.[17]

IHOP's Southeast Manager contacted Mr. Mire and told him IHOP corporate needed official paperwork showing Saville's COVID test results and that Mr. Mire had to shut down IHOP #434 and have it sanitized.[18] IHOP's policy at the time required franchise owners to shut down their restaurants if an employee tested positive for COVID, hire a COVID cleaning company, and reopen the restaurant after it was cleaned.[19] Thus, Mr. Mire closed the restaurant and hired the COVID cleaning company.

Mr. Mire contacted Saville for the paperwork corporate requested, and she sent him a work excuse letter from the emergency room which stated that Saville "was seen and treated in our emergency department on 3/9/2020. She may return to work on 03/24/20."[20] Mr. Mire continued to contact Saville throughout the day and evening on March 10th seeking her travel information because "IHOP corporate is concerned about where you went while on the cruise" and "which date[s] you

---

[16] Mire Depo., pp. 96-100, Exhibits 7 and 8 [Docs. 35-8, 35-9].
[17] *Id.* at pp. 67-68.
[18] *Id.* at pp. 67-70, 74-75.
[19] *Id.* at p. 91.
[20] Doc. 35-5, p. 3.

travelled" and seeking the results from her COVID test because "IHOP corporate is waiting."[21] Saville sent him her travel information and told him she would send the test results as soon as she received them.[22]

On March 11 and 12, Mr. Mire again asked Saville to send the test results because "[w]e cannot open the store until you present the paperwork to me so I can send it to ihop corporate"[23] and "we can open the restaurant[.]"[24] Saville sent the emergency room paperwork, but it did not show that she had received a COVID test.[25] Mr. Mire texted her: "I see the papers but this is nothing showing you went to get tested for corona virus. That what we need that's what ihop corporate is waiting for."[26] Thus, at Mr. Mire's direction, Saville states she called the hospital with Mr. Mire on the phone, and a nurse verbally told them that Saville's test results were negative.[27] The nurse stated she could not provide those results in writing.[28] Saville never received written results of her test at the emergency room on March 9th.[29]

By March 15, 2020, IHOP corporate wanted Saville to take another COVID test.[30] Thus, Saville went to an urgent care center, received a second test, and gave

---

[21] Text messages between Plaintiff and Mire, pp. 5, 11 [Doc. 34-5].
[22] *Id.* at pp. 5-8
[23] *Id.* at p. 12.
[24] *Id.* at p. 14.
[25] *Id.* at pp. 14-20.
[26] *Id.* at p. 20.
[27] Pl. Depo., pp. 22-23.
[28] *Id.* at p. 23.
[29] *Id.* at p. 21.
[30] Mire Depo., p. 82.

permission for the results to be released to Mr. Mire. [31] The next day, on March 16, 2020, Saville's test results came back negative; Mr. Mire received the results and sent them to IHOP corporate.[32] Saville states that although her test results were negative, she had been told "to follow the quarantine all the way out" until March 24, 2020.[33] After Mr. Mire received the negative test results, he and Saville had very little communication. Saville states that he would not respond to her.[34]

On March 25, 2020, the day after her self-quarantine ended, Saville received a termination letter.[35] The letter states she was fired for "[i]ntentional false reporting of COVID-19 infection, creating shutdown of IHOP Store 434 in Athens, Georgia resulting in massive loss of income and in mandatory decontamination costs to owner."[36] It is unclear from the record how long IHOP #434 was closed. Mr. Mire states that it cost him $7,000 for the COVID cleaning company, and because of the chemicals used to clean the restaurant, he lost between $4,000-$7,000 in food and inventory loss.[37]

Saville filed suit against Adday-I for violations of the ADA and FMLA, and Adday-I filed counterclaims against Saville for negligent misrepresentation and

---

[31] Mire Depo., p. 83; Pl. Depo., p. 27.
[32] Mire Depo., p. 87; Pl. Depo., pp. 30-33.
[33] Pl. Depo., p. 65.
[34] *Id.* at p. 64.
[35] *Id.*
[36] Notice of Termination Letter [Doc. 34-2].
[37] Mire Depo., pp. 93-94.

fraud under Georgia law. Both parties have moved for summary judgment on the claims asserted against them.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[38]  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[39]  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[40]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[41]  The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[42]  If the moving

---

[38] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).
[39] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).
[40] *See id.* at 249-52.
[41] *See id.* at 254-55; *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992).
[42] *Celotex,* 477 U.S. at 323 (internal quotation marks omitted).

party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.[43] This evidence must consist of more than mere conclusory allegations or legal conclusions.[44]

"A fact is material for the purposes of summary judgment only if it might affect the outcome of the suit under the governing law."[45] Furthermore, "[a]n issue [of material fact] is not 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'"[46] "A mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence from which a jury could reasonably find for the non-moving party."[47] Accordingly, if the moving party shows "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party" then "it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact."[48]

---

[43] *See* Fed. R. Civ. P. 56(e); *see also Celotex,* 477 U.S. at 324-26.

[44] *Avirgnan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).

[45] *Kerr v. McDonald's Corp.,* 427 F.3d 947, 957 (11th Cir. 2005) (internal quotations omitted).

[46] Flamingo S. Beach I Condo. Ass'n, Inc. v. Selective Ens. Co. of Southeast, 492 F. App'x 16, 26 (11th Cir. 2012) (quoting Anderson, 477 U.S. at 249-50).

[47] *Id.* (citing *Anderson,* 477 U.S. at 252).

[48] *Rich v. Sec'y, Fla. Dept. of Corr.*, 716 F.3d 525, 530 (11th Cir. 2013) (citation omitted).

The standard for cross-motions for summary judgment is no different from the standard applied when only one party moves for summary judgment.[49] The Court must consider each motion separately, resolving all reasonable inferences against the party whose motion is under consideration.[50]

## DISCUSSION

### ADA Discriminatory Termination

Adday-I it is entitled to summary judgment on Saville's "regarded as" ADA discriminatory termination claim because her COVID-19 impairment was "transitory and minor" and therefore excluded under the ADA.

Title I of the ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees."[51] A plaintiff may prove disability discrimination with direct or circumstantial evidence.[52] To establish discrimination through circumstantial evidence, a plaintiff must satisfy the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[53] Here, Saville puts forth no direct evidence of discrimination,[54] and thus the Court analyzes her claim in

---

[49] *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

[50] *Id.*

[51] 42 U.S.C. § 12112(a).

[52] *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001)

[53] 411 U.S. 792 (1972); *see also Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021).

[54] Direct evidence is that which, "if believed, proves the existence of a fact without inference or presumption." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021) (internal quotation marks and citation omitted). Under Eleventh Circuit precedent, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor, constitute direct evidence of

accordance with the *McDonnell Douglas* framework.

Under that framework, the plaintiff bears the initial burden to establish a *prima facie* case of discrimination.[55] If the plaintiff makes a *prima facie* case, the defendant must articulate a legitimate, nondiscriminatory explanation for the adverse employment action.[56] If the defendant meets its burden, the plaintiff must ultimately prove by a preponderance of the evidence that the defendant's explanation is a pretext for unlawful discrimination.[57]

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must establish that: (1) she is disabled under the ADA, (2) she is a qualified individual, and (3) she was unlawfully discriminated against because of her disability.[58] To satisfy the requirement that an individual is "disabled" within the meaning of the ADA, the individual must demonstrate: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[59]

---

discrimination." *Akouri v. St. of Fla. Dep't of Transp.*, 408 F.3d 1338, 1347 (11th Cir. 2005) (internal quotation marks and citation omitted).

[55] *Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335, 1339 (11th Cir. 2017).

[56] *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc).

[57] *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).

[58] *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (citations omitted); *Knowles v. Sheriff*, 460 F. App'x 833, 835 (11th Cir. 2012).

[59] 42 U.S.C. § 12102(1)(A)-(C).

Saville's claim is brought pursuant to the "regarded as" theory of disability.[60] An individual will be "regarded as" disabled if the individual establishes that "he or she has been subjected to adverse action prohibited under [the ADA] because of an actual or perceived mental or physical impairment, whether or not the impairment limits or is perceived to limit a major life activity."[61] A person can be "regarded as" disabled within the meaning of the ADA even if the employer mistakenly believes that the impairment is limiting.[62]

But a plaintiff cannot proceed on a "regarded as" claim that is "transitory and minor." The ADA provides that a "regarded as" claim "shall not apply to impairments that are transitory and minor."[63] An impairment is transitory if it has an "actual or expected duration of 6 months or less."[64] The ADA does not define "minor." Whether an impairment "is or would be 'transitory and minor' is to be determined objectively."[65] Thus, "an employee has a 'disability' under the ADA when that employee has or is perceived as having, an impairment that is not transitory and minor."[66]

---

[60] In its Order on Defendant's Motion to Dismiss, the Court found Plaintiff failed to sufficiently allege facts to support she suffers from an actual disability or a record of disability under the ADA. Plaintiff fails to allege any additional allegations in her proposed Amended Complaint that would allow her to proceed on an actual disability or record of disability claim. Thus, her ADA discriminatory termination claim may only proceed if she sufficiently states that claim under the "regarded as" theory of disability. [Doc. 16, pp. 5-6].

[61] 42 U.S.C. § 12102.

[62] *Murphy v. UPS, Inc.,* 527 U.S. 516, 521-22 (1999).

[63] 42 U.S.C. § 12102(3)(B).

[64] 42 U.S.C. § 12102.

[65] 29 C.F.R. § 1630.15(f).

[66] *EEOC v. STME, LLC,* 938 F.3d 1305, 1315 (11th Cir. 2019).

In December 2021, the EEOC released guidance about when COVID-19 can constitute a disability under the ADA ("EEOC Guidance").[67] The EEOC Guidance notes that COVID-19 may be a "regarded as" a disability "depending on the facts."[68] The common theme in this guidance is that COVID-19 may be a disability when it is long term—lasting for months—but not when it is acute.[69] Federal courts agree and generally find that a COVID-19 infection—absent persistent, long-lasting symptoms—is a transitory and minor impairment.[70]

Saville's perceived COVID-19 infection was a transitory and minor impairment. She developed COVID-19 symptoms on March 9, 2023. Her symptoms were not severe: they consisted of fever, shortness of breath, body aches, and chills, that lasted at most five days.[71] She had a single visit to the emergency room where she was tested, x-rayed, administered Tramadol for pain and chills, and released to go home with a return-to-work date two weeks later on March 24, 2020.[72] She received no other treatment except to take Tylenol.[73] She tested negative for COVID-19 on March 16, 2020.  As a matter of law, Saville's perceived COVID-19 impairment, was objectively transitory and minor. Thus, Mr. Mire did not regard her as

---

[67] *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* ("EEOC Guidance"), U.S. EEOC (Dec. 14, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last updated July 12, 2022).
[68] *Id.* at N6.
[69] *Id.* at N4.
[70] *See Toney v. Alabama A&M Univ.*, Case No. 5:21-cv-689(LCB), 2023 WL 1973203 (Feb. 13, 2023)
[71] Pl. Depo., pp. 25-26.
[72] *Id.* at pp. 24-25.
[73] *Id.* at p. 25.

having an impairment for purposes of the ADA, and Saville has failed to establish a *prima facie* case of ADA discrimination.

## ADA Retaliation

"The ADA prohibits retaliation against an individual for opposing an unlawful practice or making a charge under the ADA."[74] ADA retaliation claims are analyzed under the same framework that is employed for retaliation claims that arise under Title VII.[75] "To prevail on [Saville's] ADA retaliation claim, she must show that (1) [she] engaged in a statutorily protected expression, (2) [she] suffered an adverse employment action, and (3) there was a causal link between the two."[76] Once Saville establishes a *prima facie* case of retaliation, "the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation."[77] Saville must then show that she will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretext "designed to mask retaliation."[78] Ultimately, to establish the necessary causation, the plaintiff must demonstrate that her "protected activity was the but-for cause of the alleged action by the

---

[74] *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing 42 U.S.C. § 12203(a)); *see also Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (citation omitted).

[75] *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (citation omitted); *Double v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 895 (11th Cir. 2014).

[76] *Frazier-White*, 818 F.3d at 1258 (citation omitted).

[77] *Stewart*, 117 F.3d at 1287 (citation omitted).

[78] *Id.*

14

employer."[79]

Saville argues Adday-I terminated her in retaliation for seeking a reasonable accommodation to self-quarantine and requiring her to come into work to perform payroll. Adday-I contends it legitimately terminated Saville because she falsely told the food delivery driver she had contracted COVID-19, which in turn led to the closure and disinfection of the restaurant, resulting in loss of revenue and food inventory. Assuming her request to self-quarantine qualifies as a request for a reasonable accommodation (and therefore constitutes protected activity), Saville ultimately fails to present sufficient evidence from which a reasonable jury could conclude that but-for Saville's request to quarantine, Adday-I would not have fired her.

First, by her own testimony, Saville states she was retaliated against because she had previously rebuffed Mr. Mire's advances, not because of any request to quarantine.[80] She testified that Mr. Mire "wanted something out[side] of work. . . . So, yes, I felt like he found the way to get rid of me and that was retaliation against the things that I wouldn't do in the past."[81] Second, Adday-I did not terminate Saville when she requested to quarantine; she was only told that her time off would be unpaid because she had already used her paid time off for vacation. Adday-I only terminated Saville after IHOP corporate

---

[79] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S.338, 362 (2013); *see also Hughes v. Wal-Mart Stores East, LP*, 846 F. Appx. 854, 858-59 (11th Cir. 2021) ("Regardless, the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action.").
[80] Pl. Depo., pp. 93-95.
[81] *Id.* at p. 95.

required the restaurant's closure after the food delivery driver reported that Saville had been inside the restaurant and told him she had COVID-19. Thus, no reasonable jury could find Saville's request to quarantine was the but-for cause of her termination.

The federal judiciary is not in the business of examining whether employment decisions are fair, prudent, or wise.[82] The courts are concerned only with "whether unlawful discriminatory animus motives a challenged employment decision."[83] No reasonable jury could find Adday-I was discriminatorily motivated to retaliate against Saville because she requested to quarantine. Thus, Adday-I is entitled to summary judgment on Saville's ADA retaliation claim.

**FMLA Interference**

Saville contends Adday-I failed to inform her and provide her notice of her FMLA rights, denied her protected medical leave following her request, and ultimately interfered with her ability to exercise her FMLA rights. Adday-I contends it is not a covered employee under the FMLA because it employs less than 50 employees, and Saville has failed to meet her burden to show a genuine issue of fact that it can be considered a single integrated employer with another corporate entity owned by Mr. Mire. The Court agrees.

The FMLA makes it illegal "for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."[84] To

---

[82] *Owens v. Governor's Off. Of Student Achievement*, 42 F.4th 1327, 1333 (11th Cir. 2022).
[83] *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).
[84] 29 U.S.C. § 2615(a)(1).

establish an FMLA interference claim, an employee "must demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled."[85] "In addition to showing interference, a plaintiff must show that she has been prejudiced by the FMLA violation in some way."[86]

The FMLA only covers employees who employ at least 50 employees within a 75-mile radius of the worksite.[87] It is undisputed Adday-I employs less than 50 employees. In addition to Adday-I, located at 1180 Baxter Street, Athens, Georgia, Mr. Mire owns and operates Adday-II, Inc.[88], located at 4276 Lavista Road, Tucker, Georgia ("Adday-II").[89] Both locations are traditional franchise IHOP restaurants and are located within 75 miles of each other.[90] Saville contends Adday-I and Adday-II can be considered a single employer for purposes of FMLA because they meet the "integrated employer test."

Under the integrated employer test, "[s]eparate entities will be deemed to be parts of a single employer for purposes of FMLA . . . [and if] this test is met, the employees of all

---

[85] *Pereda v. Brookdale Senior Living Communities*, 666 F.3d 1269, 1274 (11th Cir. 2012). (citation omitted.

[86] *Diamond v. Hospice of Fla. Keys, Inc.*, 677 F. App'x 586, 592 (11th Cir. 2017) (citing *Martin v. Brevard Cty. Pub. Schs.*, 543 F.3d 1261, 1265 (11th Cir. 2008)).

[87] 29 U.S.C. § 2611(2)(B)(ii).

[88] Plaintiff did not name Adday-II, Inc. as a Defendant in this action. Although unclear, the Court will assume Plaintiff is not required to add Adday-II, Inc. as a Defendant for determining whether her employer, Defendant Adday-I, Inc. can be deemed a covered employer through the integrated employer test. *See May v. AT&T Corp.*, 2013 WL 3357005, *10 (N.D. Ala. 2013) ("If the plaintiff's actual[] employer is a named defendant, the numerical requirement for a minimum number of employees can be met by showing that the 'employer' is part of a larger 'integrated employer.'); *but see Avena v. Imperial Salon & Spa, Inc.*, Case No. 6:18-cv-89-ORL, 2018 WL 9815806, at *3 (M.D. Fla. Nov. 27, 2018) (stating that "[t]he integrated employer test imposes equal liability upon two or more entities that, in reality, function as a single, monolithic employer"; by implication, both would need to be named as defendants).

[89] Mire Depo Exs. 1 and 2.

[90] Mire Depo., pp. 14, 21-22; Ex. 1 and 2.

entities making up the integrated employer will be counted in determining employer coverage and employee eligibility."[91] Courts "may look beyond the nominal independence of two or more entities and treat ostensibly separate businesses as a single employer for the purposes of a claim arising under . . . the FMLA."[92] In determining whether separate entities should be considered a single employer or integrated enterprise, courts look to four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."[93] "The totality of circumstances controls; thus, no single factor is conclusive, and the presence of all four factors is not necessary to a finding of single employer."[94]

"Common ownership of two corporations is not enough for a jury to conclude that two separate entities are integrated into a single operation for the purposes of FMLA."[95] The "single employer" theory "concentrate[s] on the degree of control an entity has over the adverse employment decision on which the . . . suit is based."[96] Indeed, courts often refine "their [single employer] analysis to the single question: 'What entity made the final

---

[91] 29 C.F.R. § 825.104(c)(2).

[92] *Hein v. IMS Gear Holding, Inc.*, Case No. 2:16-cv-81-RWS, 2018 WL 1833254, * 7 (N.D. Ga. Jan. 31, 2018) (citations omitted).

[93] *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999).

[94] *Hein*, 2018 WL 1833254 at *7 (internal quotation marks and citation omitted).

[95] *Morales v. Contemp. Constr. Servs., Inc.*, Case No. 6:08-cv-1762, 2009 WL 10670018, at *6 (M.D. Fla. July 13, 2009) (citing *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1257 (11th Cir. 2004)).

[96] *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998).

decisions regarding employment matters related to the person claiming discrimination?'"[97]

The record conclusively establishes that Adday-I made the final decision on all employment matters related to Saville. Saville performed no employment duties at the IHOP owned by Adday-II. Plaintiff's arguments all rest on the fact Mr. Mire owns and operates both IHOP restaurants. But, as stated above, "[c]ommon ownership of two corporations is not enough for a jury to conclude that two separate entities are integrated into a single operation for the purposes of FMLA."[98] The record evidence is insufficient as a matter of law to show Adday-I and Adday-II "are integrated into a single operation." Each location has its own general manager and own employees.[99] Although Mr. Mire stated that sometimes he will bring a missing item from one location to the other, and occasionally he will send a cook to help at the other location for a day, the restaurants do not share inventory and have separate employees.[100] Because Adday-I does not meet FMLA's numerosity requirement, it is not a covered employer subject to the FMLA, and Plaintiff's claim fail as a matter of law.

## Negligent Misrepresentation/Fraud

Finally, Saville moves for summary judgment on Adday-I's counterclaims against

---

[97] *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997) (citation omitted); *see also Walker v. Banks, Finley, White & Co. of Ga., P.C.*, Case No. 1:19-cv-5461-CAP-RDC, 2020 WL 10181661, at *1 (N.D. Ga. Aug. 20, 2020).

[98] *Morales*, 2009 WL 10670018 at *6 (citing *Morrison*, 383 F.3d at 1257).

[99] Mire Depo., pp. 40.

[100] *Id.* at p. 42.

for negligent misrepresentation and fraud. Adday-I claims Saville falsely stated that she had been diagnosed with COVID-19, a statement which she knew to be false, which, in turn, caused the closure of IHOP #434 for multiple days, resulting in loss of customer revenue and food inventory. Saville argues no genuine issue of material fact exists to support these claims, and the Court agrees.

To establish fraud under Georgia law, a plaintiff must present evidence of an intentional misrepresentation of a material fact by the defendant upon which the plaintiff justifiably relied to his detriment.[101] To establish negligent misrepresentation, a plaintiff must establish: (1) the negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.[102]

The record contains no evidence substantiating that Saville intentionally misrepresented or falsely reported that she had COVID-19 to the delivery driver or to Adday-I. On the contrary, even assuming she told the driver she had contracted COVID-19, such disclosure was not only reasonable, it was prudent. She had returned from an international cruise where she had been exposed to COVID-19; she was experiencing symptoms commonly associated with COVID-19; and she had just been tested for COVID-19 and was awaiting her results when she encountered the delivery driver. Although a

---

[101] *Segars v. Cleland*, 255 Ga. App. 293, 297 (2002) (citation omitted).
[102] *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas*, 267 Ga. 424, 426 (1997).

factual dispute exists whether Saville told the driver she had specifically contracted COVID-19 or not, no reasonable jury could find she intentionally misrepresented or falsely reported that she had contracted it. Moreover, Adday-I closed the restaurant pursuant to IHOP's corporate policy, and it is undisputed when the restaurant was closed, Saville was still awaiting her test results and had been directed to self-quarantine by medical personnel. Thus, Adday-I's Counterclaim for fraud and negligent misrepresentation fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the parties' Motions for Summary Judgment [Doc. 33 and 35] are **GRANTED**.

**SO ORDERED**, this 31st day of March, 2023.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT